UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

FOR ONLINE PUBLICATION ONLY

CARLOS A. ORELLANA,

         Plaintiff,

- versus -

CAROLYN W. COLVIN,

         Defendant.

MEMORANDUM
AND ORDER
14-CV-6812 (JG)

A P P E A R A N C E S:

 KLEE & WOOLF
  350 Willis Avenue
  Mineola, NY 11501
 By: Jonathan R. Klee
  *Attorneys for Plaintiff*

 KELLY T. CURRIE
 Acting United States Attorney
  Eastern District of New York
  271 Cadman Plaza East, 7th Floor
  Brooklyn, New York 11201
 By: Matthew Silverman
  *Attorney for Defendants*

JOHN GLEESON, United States District Judge:

  On November 19, 2014, Carlos Orellana brought this action against the Acting Commissioner of Social Security ("Commissioner"), seeking review of the Commissioner's final decision that Orellana was not disabled and therefore not entitled to disability insurance benefits under the Social Security Act ("the Act"). The parties cross-move for judgment on the pleadings, the Commissioner seeking affirmation and dismissal and Orellana seeking a reversal of the Commissioner's decision and a remand for further proceedings. For the reasons that follow, the Commissioner's motion is denied and Orellana's motion is granted.

BACKGROUND

Orellana was born in Honduras on May 5, 1969. R. at 58.[1] He has a sixth grade education and does not speak English. *Id.* at 203, 205. Orellana worked as a fireworks assembler for three years until a work accident on June 6, 2010 ("the June 6 accident"). *Id.* at 60. On that date, Orellana was preparing explosives at work when a fuse he was handling exploded, throwing him backwards and burning him. *Id.* at 59-60. He suffered burns to his arms, hands, and neck. *Id.* at 253-55, 472-83.

A. *The Procedural History*

On April 19, 2012, Orellana filed an application for disability insurance benefits under Title II of the Social Security Act. *Id.* at 168-73, 200, 204. In his application, Orellana stated that he had last worked on June 6, 2010 due to a variety of physical impairments caused by the accident discussed above. *Id.* at 200, 204. Orellana's application was initially denied on August 6, 2012. *Id.* at 77, 80-91. Orellana sought reconsideration of that denial and appeared at a hearing on May 9, 2013 ("the hearing") before an Administrative Law Judge ("ALJ"), where he was represented by counsel and aided by a Spanish language interpreter. *Id.* at 26, 54-69. The ALJ issued a decision on July 3, 2013, which held that Orellana was not disabled. *Id.* at 26-36. On September 26, 2014, the ALJ's decision became the final decision of the Commissioner when the Appeals Council denied Orellana's request for review. *Id.* at 1-4. Orellana then commenced this action, which challenges the Commissioner's decision.

B. *The Medical Evidence*

Orellana was taken to the emergency department of Stony Brook University Hospital ("Stony Brook") after the June 6, 2010 fireworks accident and stayed there for four days. *Id.* at 253-55. At Stony Brook, Orellana's treatment consisted of burn care, which was

---

[1] Citations in the form "R. at __" refer to pages of the administrative record.

administered twice daily; no other treatment was necessary at the time. *Id.* at 254. Stony Brook's progress notes indicate that the explosion had caused Orellana to land on his back, and a computed tomograph ("CT") scan of his thoracic spine was performed to detect possible trauma he may have sustained. *Id.* at 254, 335-36. The scan revealed mild degenerative changes of the thoracic and lumbar spine, but no acute fracture or subluxation. *Id.* at 335-36. A magnetic resonance imaging ("MRI") study of Orellana's cervical spine, performed on June 7, 2010, revealed no evidence of ligamentous injury, spinal cord injury, intraspinal hematoma, or large disc protrusions. *Id.* at 353. Orellana was discharged without restrictions on June 10, 2010. *Id.* at 250-51. He followed up at Stony Brook for burn wound care three times the following week. *Id.* at 472-83.

    1. *Orellana's Treating Physicians*

    On October 7, 2010, Orellana saw Dr. Afshin Razi of Madison Avenue Orthopedic Associates for a Workers' Compensation evaluation. *Id.* at 258-60. Orellana reported neck and mid-back pain, which he attributed to the June 6 accident. *Id.* at 258. Orellana also reported associated radicular symptoms into his left shoulder and hand; occasional numbness and tingling in his left arm; and "heaviness" in his lower extremity. *Id.* Razi's initial positive clinical findings included a mild waddling gait; mild spasm over the cervical and thoracic paraspinal muscles; and a mild decrease in range of motion (and corresponding pain) in the left shoulder. *Id.* at 259. The results of Orellana's neurological examination were unremarkable. *Id.* Razi reviewed Orellana's X-Ray results, and noted that there was a possible "T6 superior endplate compression deformity;" he ordered an MRI in connection with this observation. *Id.* at 259-60. Razi stated that Orellana was "Temporarily Totally Disabled 100%."

3

*Id.* at 260. An MRI of Orellana's thoracic spine performed by another doctor later that month revealed small disk herniations. *Id.* at 257.

Orellana saw Dr. Razi again on November 18, 2010. *Id.* at 261-62. Orellana reported constant aching pain in his neck, and that bending his neck forward exacerbated the pain. *Id.* at 261. Razi prescribed Nucynta, a course of physical therapy, and ordered an MRI of the cervical spine. *Id.* Razi noted that an electromyogram ("EMG") study might be needed to evaluate the pain in Orellana's upper extremities should the MRI prove inconclusive, and further advised Orellana to avoid "provocative activities including bending, twisting, lifting, pushing, and pulling." *Id.* Razi assessed a total 100% temporary disability for the purpose of the Workers' Compensation evaluation. *Id.*

An MRI of Orellana's cervical spine on December 14, 2010 yielded a number of findings, including levoconvex scoliosis; numerous posterior disc bulges and herniations (including impression and abutment of the ventral cord with resultant central canal stenosis); and diffuse disc hydration loss. *Id.* at 290-91.

When Orellana followed up with Dr. Razi on December 23, 2010, Razi's findings and Orellana's complaints remained largely unchanged from their previous session. *Id.* at 263-64. Razi noted "obvious irritability" when Orellana extended his cervical spine from the forward flexed position to 40 degrees. *Id.* at 263. Razi reviewed the MRI report of Orellana's thoracic spine and noted that it failed to explain Orellana's "unsteadiness" as well as his bladder dysfunction. *Id*. at 264. Razi stated that if the MRI of Orellana's cervical spine proved similarly inconclusive, a consultation with a neurologist for further evaluation, and possibly an epidural steroid injection ("ESI"), would be the next options. *Id*. Razi assessed a 100% temporary disability for the third time. *Id.*

4

On January 18, 2011, Dr. Barry Katzman performed an orthopedic independent medical examination ("IME") in connection with Orellana's Workers' Compensation claim. *Id.* at 346-49. Orellana's complaints regarding his neck and back pain, as well as his radicular symptoms, remained consistent. *Id.* at 348. Katzman's positive clinical findings included reduced range of rotation in Orellana's cervical spine; tenderness in areas of Orellana's cervical and lumbar spine, as well as in the cervical paraspinal muscles; and decreased sensation in the left upper and lower extremity, as well as in the left hand. *Id.* at 349. Katzman's general impressions concerning Orellana's condition consisted of bilateral hand burns; cervical strain/radiculopathy; and lumbar strain. *Id.* He concluded that the "injuries [were] causally related to the accident," and assessed "moderate disability," restricting Orellana to lifting no more than 20 pounds. *Id.* at 346.

On March 17, 2011 Orellana reported to Dr. Kiril Kiproviski, a neurologist, for a risk consultation regarding cervical ESI's. *Id.* at 350-51. Orellana continued to report essentially unchanged symptoms. *Id.* at 350. Kiproviski's positive clinical findings included diminished range of motion in Orellana's cervical and lumbar spines, and somewhat diminished sensation in Orellana's left "great" toe. *Id.* at 350-51. Kiproviski concluded that Orellana was suffering from chronic axial cervical spine, and that Orellana's neurological exam was benign. *Id.* at 351. Kiproviski found no neurological contraindications for cervical epidural injections. *Id.* Accordingly, Orellana received his first ESI at the C7 level on April 18, 2011. *Id.* at 265.

On May 19, 2011 Orellana returned to Dr. Razi for another Workers' Compensation follow-up. *Id.* at 266-68. Orellana stated that the ESI had provided no relief. *Id.* at 266. Razi reviewed the results of the December 2010 MRI of Orellana's thoracic spine and discussed with Orellana the reasonable outcome of a surgical procedure. *Id.* at 267. Razi again

assessed Orellana as 100% temporarily disabled. *Id.* The next follow-up, conducted by Razi on August 4, 2011, was identical in most respects and his disability assessment remained unchanged. *Id.* at 269-71.

On September 20, 2011 Orellana returned to Dr. Katzman for another IME in connection with his Workers' Compensation claim. *Id.* at 343-45. Orellana stated that his neck and back felt the same. *Id.* at 343. Katzman noted decreased sensation in the left upper and lower extremity, as well as in the left hand; decreased flexion in the lumbar spine; and tenderness in the lumbar spinous processes. *Id.* at 344. Katzman's diagnoses remained unchanged from the January 18, 2011 session—this time, however, he opined that there was "no need for further orthopedic or physical therapy treatment." *Id.* at 345. He assessed a "permanent moderate causally related disability of no lifting more than 20 pounds." *Id.*

On October 18, 2011, Orellana presented to Dr. Juan Robles, a physical medicine and rehabilitation specialist, at Spine Sports Occupational Rehabilitation Associates. *Id.* at 286-88. Robles's positive clinical findings regarding the cervical spine included restricted range of motion with mid-back pain; tenderness to palpation in some cervical and lumbar paraspinal muscles; and decreased range of motion in the lumbar spine. *Id.* at 287. Robles diagnosed cervical and thoracic herniated nucleus pulposus; cervical and lumbar radiculopathy; thoracic strain; and lumbar degenerative disc disease. *Id.* Robles stated that an electromyography nerve conduction ("EMG/NCV") and an MRI were needed to clarify symptoms of radiculopathy. *Id.* at 288. Robles prescribed Prednisone, Celebrex, Flexeril, and Conzip; administered a trigger point injection; and ordered a series of additional injections. *Id.* at 287.

Dr. Robles ordered an MRI of Orellana's lumbar spine, which was performed on November 1, 2011 and showed straightening of the normal lumbar lordosis; L5-S1 disc

6

desiccation and bulge indenting the ventral epidural space; and mild facet hypotrophic changes on the right. *Id.* at 296. An EMG/NCV study of Orellana's lower extremities conducted by Dr. Robles on November 15, 2011 revealed "evidence suggestive of a [bilateral] lower lumbosacral radiculopathy, most likely L5-S1, without distal denervation." *Id.* at 313. Another EMG/NCV conducted by Robles on November 29, 2011 of Orellana's upper extremities revealed bilateral lower cervical radiculopathy without distal denervation. *See id.* at 308-11. On December 16, 2011 Orellana received an epidural spinal nerve block injection in his lumbar spine at Robles's office. *Id.* at 307. On March 2, 2012 Orellana returned to Robles's office for ESI pain injections. *Id.* at 304.

On April 25, 2012 Orellana returned to Dr. Robles, who reported positive clinical findings in his evaluation. *Id.* at 424-25. Robles found decreased range of motion in Orellana's cervical and lumbar spine; diminished motor muscle testing in the left upper and right lower extremities; back pain with certain movements; and palpations of the cervical, thoracic, and lumbar spine. *Id.* at 424. Robles stated that Orellana was 100% temporarily disabled. *Id.* at 427. On June 19, 2012 Orellana returned to Robles with essentially identical complaints; Robles's findings and disability assessment remained consistent. *See id.* at 429-32.

2. *The Workers' Compensation Medical Examination*

On April 18, 2012 Orellana presented to Dr. John Mazella for an orthopedic IME in connection with his Workers' Compensation claim. *Id.* at 338-42. Mazella stated in his report that Orellana exhibited "abnormal pain behavior" and "notably submaximal" efforts during range of motion testing, and went on to conclude that Orellana's complaints were not supported by objective clinical findings. *Id.* Mazella assessed Orellana's burns as healed. *Id.* at 340-41. For the Workers' Compensation assessment, Mazella stated that Orellana was able to return to his

full duty in his prior occupation without any restrictions. *Id.* at 341. Mazella noted he was unsure whether Orellana had undergone EMG testing (which he had), and therefore did not review those tests. *Id.* at 339.

## DISCUSSION

A. *Legal Standards*

    1.     *42 U.S.C. 405(g)*

In order for a claimant to be eligible for Social Security benefits, he must "not only [be] unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. § 423(d)(2)(A). This inability to work must be brought about by a "medically determinable physical or mental impairment which . . . has lasted or can be expected to last for a continuous period of not less than 12 months." *Id.* § 423(d)(1)(A). The Social Security Administration ("SSA") has put forth a five-step sequential analysis that the Commissioner must adhere to when making his disability determination. 20 C.F.R. § 404.1520(a)(4)(i)-(v):

> First, the Commissioner considers whether the claimant is currently engaged in substantial gainful activity. If he is not, the Commissioner next considers whether the claimant has a severe impairment which significantly limits his physical or mental ability to do basic work activities. If the claimant suffers such an impairment, the third inquiry is whether, based solely on medical evidence, the claimant has an impairment which is listed in Appendix 1 of the regulations. If the claimant has such an impairment, the Commissioner will consider him disabled without considering vocational factors such as age, education, and work experience; the Commissioner presumes that a claimant who is afflicted with a listed impairment is unable to perform substantial gainful activity. Assuming the claimant does not have a listed impairment, the fourth inquiry is whether, despite the claimant's severe

8

> impairment, he has the residual functional capacity to perform his past work. Finally, if the claimant is unable to perform his past work, the Commissioner then determines whether there is other work which the claimant could perform.

*McClaney v. Astrue*, No. 10-CV-5421(JG)(JO), 2012 WL 3777413, at *3 (E.D.N.Y. Aug. 10, 2012) (quoting *DeChirico v. Callahan*, 134 F.3d 1177, 1179-80 (2d Cir. 1998) (internal quotation marks and alterations omitted)); 20 C.F.R. § 404.1520(a)(4)(i)-(v). While the claimant bears the burden of proof in the first four steps, the Commissioner bears it in the fifth. *Green-Younger v. Barnhart*, 335 F.3d 99, 106 (2d Cir. 2003).

Applying that rubric here, the ALJ first found that Orellana had not engaged in substantial gainful activity during the period from the alleged onset date of June 6, 2010 through his "date last insured" of March 31, 2013. R. at 28. At the second step, the ALJ found that Orellana had the following severe impairments: status post first degree burns of the face; status post second degree burns on his forearms; degenerative disc disease of the cervical, thoracic, and lumbar spine (*i.e.*, back injury); bilateral hand pain; left arm numbness, numbness of the fingers, and gastritis; and radicular pain in the cervical and lumbar regions. *Id.* At step three, the ALJ determined that Orellana did not have an impairment that met or equaled the severity of one of the listed impairments in 20 C.F.R. § 404, Subpart P, Appendix 1. *Id.* at 29.

At the fourth step, the ALJ determined that Orellana could not perform his past relevant work. *Id.* at 34. However, he did find that Orellana had the residual function capacity ("RFC") to do light work: "The claimant's severe impairments, symptoms and subjective complaints result in limitations on his residual functional capacity, and although for the performance of light work [sic]." *Id.*

As part of his reasoning, the ALJ found that Orellana's "statements concerning the intensity, persistence, and limiting effects of [his symptoms]" were less than "entirely

9

credible." *Id.* at 32. At the fifth and final step, the ALJ used the Medical Vocational Guidelines Rule 202.18 as a framework for his decision that Orellana was not disabled. *Id.* at 35.

    2.    *The Treating Physician Rule*

Under the treating physician rule, the Commissioner must "give more weight to opinions from [a claimant's] treating sources since these sources are likely to be . . . most able to provide a detailed, longitudinal picture" of the claimant's condition, as compared to "objective medical findings" or "reports of individual examinations, such as consultative examinations or brief hospitalizations." 20 C.F.R. § 404.1527(c)(2). Accordingly, the rule "mandates that the medical opinion of a claimant's treating physician [be] given controlling weight if it is well supported by medical findings and not inconsistent with other substantial record evidence." *McClaney*, 2012 WL 3777413, at *14 (alteration in original) (quoting *Shaw v. Chater*, 221 F.3d 126, 134 (2d Cir. 2000)). In circumstances where the treating physician's opinion is not well supported by objective medical evidence, or is inconsistent with other substantial evidence, it need not be given controlling weight. *Burgess v. Astrue*, 537 F.3d 117, 128 (2d Cir. 2008). However, "[e]ven where a treating physician's opinion is not controlling because it conflicts with other medical evidence that might be considered 'substantial,' it is still entitled to significant weight because the treating source is inherently more familiar with a claimant's medical condition than are other sources." *McClaney*, 2012 WL 3777413, at *11 (quoting *Ellington v. Astrue*, 641 F. Supp. 2d 322 (S.D.N.Y. 2009)); *see also Greek v. Colvin*, No. 14-3799, 2015 WL 551526120, at *3 (2d. Cir. Sept. 21, 2015) (per curiam) (holding that when it is appropriate not to give the treating physician's opinion controlling weight, the ALJ must consider several factors in deciding what weight to give it, and must comprehensively set forth good reasons for the

weight assigned); C.F.R. § 404.1527(c)(2). When it is not accorded controlling weight, the determination of what weight to give a treating physician's opinion is governed by six factors:

> (1) the length of the treatment relationship and the frequency of examination; (2) the nature and extent of the treatment relationship; (3) the evidence that supports the treating physician's report; (4) how consistent the treating physician's opinion is with the record as a whole; (5) the specialization of the physician in contrast to the condition being treated; and (6) any other factors which may be significant.

*McClaney*, 2012 WL 3777413, at *11 (quoting *Papp v. Comm'r of Soc. Sec.*, No. 05-CV-5695 (AJP), 2006 WL 1000397, at *11 (S.D.N.Y. Apr. 18, 2006) (citing regulation now codified at 20 C.F.R. § 1527(c)(2)-(6)); *see also Greek*, 2015 WL 551526120, at *3. In conjunction with these factors, the ALJ must "always give good reasons" for the weight accorded to the treating physician's opinion. 20 C.F.R. § 404.1527(c)(2); *see also Burgess*, 537 F.3d at 129. The Second Circuit has consistently held that "[t]he failure to provide 'good reasons' for not crediting the opinion of a claimant's treating physician is a ground for remand." *Greek*, 2015 WL 551526120, at *3 (citing *Burgess v. Astrue*, 537 F.3d 117, 129 (2d Cir. 2008)); *Halloran v. Barnhart*, 362 F.3d 28, 33 (2d Cir. 2004).

B.   *Application to Orellana's Case*

1.   *The ALJ Did Not Accord Orellana's Treating Physician's Opinion Sufficient Weight*

In reaching his decision, the ALJ gave "little weight" to the opinions of Orellana's treating physician, Dr. Robles. R. at 33-34. The ALJ was instead "persuaded by," and thus gave "significant weight to," progress notes from Orellana's treatment at Stony Brook after the June 6, 2010 accident. *Id.* at 34. The progress notes stated that Orellana was discharged in stable condition and without any established physical limitations. *Id.*

11

Dr. Robles, a physical medicine and rehabilitation specialist, treated Orellana on a regular basis over an eight-month period, from October 18, 2011 through June 19, 2012. *Id.* at 286-88, 304-313, 362-63, 417-32, 443-44, 452-53, 467-70. The ALJ found Robles's opinion was inconsistent with the "overall evidence," and concluded that "clinically, [Orellana] ha[d] no major neurological compromise." *Id.* at 33. Thus, the ALJ accorded little weight to opinions by Robles on April 24, 2012 and June 19, 2012 "to the effect that [Orellana] could not return to work, because of multiple injuries with chronic pain, and that [Orellana] needed additional treatment[.]" *Id.* at 33.

The ALJ stated that Dr. Robles's opinion was "inconsistent with the overall evidence." *Id*. One defect in this bare assertion is that Robles's opinion, and the records of Orellana's visits to Robles's office for consultations and medical procedures, make up a significant portion of the overall record, and thus cannot be so easily dismissed. Robles's reports maintained a high degree of internal consistency across the entire period during which he treated Orellana. *Id.* at 286-88, 304-13, 362-70, 411-471. Orellana complained of substantially the same pain and ailments to Robles at every visit, and in turn Robles progressed through a variety of tests, diagnostic techniques, and treatments in a systematic effort to ascertain and treat Orellana's impairment. *See id.*

There is evidence in the record that is inconsistent with Dr. Robles's assessments. Specifically, the ALJ cites a neurological examination from October 2010, performed in conjunction with a Workers' Compensation assessment, as one piece of clinical evidence at odds with Robles's opinion (despite the fact that Dr. Razi, the physician who administered the exam, came to the same conclusion that Robles repeatedly reached as he continued to treat Orellana – namely, that Orellana was "Temporarily Totally Disabled"). *Id.* at 32, 259-60. However,

subsequent neurological examinations by Drs. Robles and Katzman, and the NYU Hospital for Joint Diseases, revealed positive clinical findings – sensation deficits; diminished muscle strength testing; positive "straight leg raise" testing; radicular distribution with paresthesias; and decreased sensation in the extremities. *Id.* at 287, 343-51, 355-60, 424. Perhaps most importantly, an EMG/NCV test performed by Robles on November 15, 2011 yielded positive neurological clinical findings which constituted "evidence suggestive of a [bilateral] lower lumbosacral radiculopathy[.]" *Id.* at 313. Thus, the single examination report from the beginning of Orellana's treatment period was not a sufficient basis for the ALJ's decision when considered alongside the subsequent neurological examinations that revealed positive findings. *Id.* at 32, 287, 313, 343-51, 355-60, 424.

Furthermore, it is unclear what weight the ALJ assigned to a single Workers' Compensation examination performed by Dr. John Mazella as part of the "overall evidence." *Id.* at 34, 338-43. The ALJ's findings appear to be consistent with Mazella's opinion, suggesting that the ALJ relied on Mazella's opinion in his RFC analysis. *Id.* In his examination, Mazella made no positive clinical findings, and opined that Orellana was exaggerating the intensity of his symptoms. *Id.* Thus, Mazella concluded that Orellana could return to his prior work. *Id.* While it is certainly true that these findings are inconsistent with those of Dr. Robles, they are based on a single consultative examination. The ALJ did not explain how heavily he weighted Mazella's opinion. And a consultative examination such as Mazella's is entitled to less weight than the opinion of a treating physician, *see* 20 C.F.R. § 404.1527(c)(2), because such examinations are often brief, are generally performed without reviewing the claimant's medical history, and offer only a glimpse of the claimant on a single day. *See Cruz v. Sullivan*, 912 F.2d 8, 13 (2d Cir. 1990). Mazella himself noted that it was "unclear whether [Orellana] ever underwent

electrodiagnostic and EMG testing[,]" R. at 339, even though Orellana had in fact undergone multiple EMG tests administered by Dr. Robles, which had confirmed cervical and lumbar radiculopathy. *Id.* at 308-11, 312-13, 339. Mazella diagnosed Orellana with resolved cervical and lumbar sprain without radiculopathy, *id.* at 341, but that diagnosis might have been different had he reviewed the EMG tests. In sum, Mazella examined Orellana only on one occasion, and the conclusions he drew from this examination are inconsistent with the other evidence in the record. *Id.* at 338-43. Accordingly, his opinion amounts to an "individual examination," and ought to be considered and weighted accordingly. 20 C.F.R. § 404.1527(c)(2).

In sum, Dr. Robles's opinion simply is not inconsistent with the "overall evidence." R. at 33-34. And it is well-supported by medically acceptable clinical and laboratory diagnostic techniques. 20 C.F.R. § 404.1527(c)(2). Robles ordered multiple MRI's, which revealed straightening of the lumbar lordosis; disc desiccation and bulge indenting the ventral epidural space; and mild facet hypotrophic changes. R. at 296, 290-91. Robles was also responsible for EMG/NCV studies of the lower and upper extremities, which revealed evidence of bilateral lower extremity and cervical radiculopathy without distal denervation. *Id.* at 312-13. While these diagnostic imaging techniques failed to confirm the cause of Orellana's symptoms, Robles employed clinical and diagnostic imaging techniques in support of his conclusions, which grew increasingly more precise as the treatment relationship went on. *Id.* at 286-88, 304-13, 362-70, 411-471. Robles's opinion was also supported by Dr. Razi's assessment of a total disability upon reviewing the December 2010 MRI. *See id.* at 267.

By dismissing Dr. Robles's opinion in two short sentences, the ALJ failed to fully explain why he found Robles's opinions failed to meet the statutory requirements. *Id.* at 33. An ALJ must "comprehensively set forth [his] reasons for the weight assigned to a treating

physician's opinion." *Burgess*, 537 F.3d at 129 (alteration in original) (quoting *Halloran*, 362 F.3d at 33). The conclusory assertion that Robles's extensive treatment history with Orellana is "not consistent with the overall evidence" does not satisfy this standard. R. at 33. The failure to provide good reasons for not crediting the treating physician's opinion is grounds for remand. *Greek*, 2015 WL 551526120, at *3; *Burgess*, 537 F3d at 129-30.

The ALJ also erred by according Dr. Robles's opinion "little" as opposed to "significant" weight. R. at 33; 20 C.F.R. § 404.1527(c)(2). Even when a treating physician's opinion is not controlling because of a defect in support or consistency, it may still be entitled to significant weight. *McClaney*, 2012 WL 3777413, at *11; 20 C.F.R. § 404.1527(c)(2). "When . . . [a] treating source's opinion [is not given] controlling weight, we apply the [six] factors listed in [the following paragraphs] to determine the weight to give the opinion." 20 C.F.R. § 404.1527(c)(2)(i)-(6). The ALJ failed to apply or even acknowledge these factors, electing instead to accord Robles's opinion a degree of weight that does not appear in the statutory provisions. *See id*; *Greek*, 2015 WL 551526120, at *3. When applying the factors under 20 C.F.R. § 404.1527(c)(2)(i)-(6) for determining the precise weight to accord a medical opinion (when not following the treating physician rule), Robles's opinion is entitled to significant weight.[2]

---

[2] For example, Dr. Robles had a prolonged treatment relationship with Orellana. R. at 286-88, 304-13, 362-70, 411-71. "When the treating source has seen [the claimant] a number of times and long enough to have obtained a longitudinal picture of your impairment, [the Commissioner] will give the source's opinion" more weight than he would otherwise. 20 C.F.R. § 404.1527(c)(2). The nature and extent of the treatment relationship was the most significant with Dr. Robles because he was more familiar with Orellana's condition than any other doctor. Robles personally performed diagnostic EMG/NCV studies, which confirmed bilateral lower extremity radiculopathy and bilateral lower cervical radiculopathy. R. at 308-13. And, as discussed above, Robles's opinion is largely consistent with the majority of the record evidence. *See id.* at 258-64, 266-71; 343-49. The ALJ acknowledged that Robles was treating Orellana within his specialization of Physical Medicine and Rehabilitation. *Id.* at 33.

2. *The ALJ Accorded Too Much Weight to the Stony Brook University Hospital Progress Notes*

The ALJ accorded "significant weight" to progress notes from Orellana's treatment at Stony Brook immediately after his accident, which seem to conflict with Dr. Robles's opinion. *Id.* at 34. An "ALJ must explain his decision to choose [an] earlier opinion over [a] more recent opinion where deterioration of a claimant's condition is possible." *Balodis v. Leavitt*, 704 F. Supp. 2d 255, 266 (E.D.N.Y. 2010). According greater weight to an earlier physician's opinion without additional explanation is legal error because a claimant's condition can deteriorate over time. *See Ligon v. Astrue*, No. 08-CV-1551 (JG)(MDG), 2008 WL 5378374, at *12 (E.D.N.Y. Dec. 23, 2010). The decision to accord progress notes from several years earlier—when the principal focus of the four-day hospital stay was the burns to Orellana's body—more weight than the extensive treatment and diagnoses of numerous treating physicians requires an explanation, and the ALJ did not offer one. 20 C.F.R. § 404.1527(c)(2). Indeed, notes from "brief hospitalizations," such as Orellana's treatment at Stony Brook, should be accorded less weight than the opinions of treating physicians. *See* 20 C.F.R. § 404.1527(c)(2).

CONCLUSION

For the foregoing reasons, Orellana's motion for judgment on the pleadings is granted and the Commissioner's motion is denied. The case is remanded for proceedings consistent with this opinion.

So ordered.

John Gleeson, U.S.D.J.


Dated: October 9, 2015
      Brooklyn, New York